# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

LEE ALVIN VINCENT,

    *Petitioner*,

vs.

E.K. McDANIEL, *et al.,*

    *Respondents*.

3:10-cv-00181-HDM-VPC

ORDER

This represented habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on the merits.

## *Background*

Petitioner Lee Vincent challenges his 2009 Nevada state conviction, pursuant to a jury verdict, of first-degree murder with the use of a deadly weapon. He is serving two consecutive life sentences with the possibility of parole on each sentence after a minimum of twenty years has been served on that sentence. Petitioner challenged the conviction on both direct appeal and state post-conviction review.

## *Governing Standard of Review*

When the state courts have adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating the state court ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011). Under this highly deferential standard of review, a federal court may not grant habeas relief merely

because it might conclude that the state court decision was incorrect. 563 U.S. at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 563 U.S. at 181-88.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g., Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 563 U.S. at 569.

## Discussion

### Ground 1: Denial of a Fully Impartial Jury

In Ground 1, petitioner alleges that he was denied rights to an impartial jury, a fair trial, and due process in violation of the Fifth, Sixth and Fourteenth Amendments due to, *inter alia*, juror bias after a juror at his trial developed a romantic attraction for his codefendant, who was pursuing a defense strategy adverse to petitioner's defense.

Approximately three hours after the verdict in the joint trial, juror Marnie Ramirez tried to visit Vincent's codefendant Ricky Vazquez at the Clark County Detention Center.[1]

That evening she penned and sent the following letter to Vazquez, using the alias Jasmin Rosales:

> Hi Ricky!                                                              10/24/08
>
> So how are you? How's your case going? I don't know much about what happened and well I wouldn't be able to help you anyway but I just want to show my support and sympathy. So my name is Jasmin so nice to meet you, I saw the profile on MySpace. And well if there's anything you think I can help you with, let me know. I went down to the Detention Center today to visit you but was told that I had to go back next Wednesday, so

---

[1]ECF No. 26-14 (Exhibit 78), at 30. All page citations herein are to the CM/ECF generated electronic document page number in the page header, not to any page number in the original transcript or document, unless noted otherwise.

I will be there to see you and so we can met [sic] each other. Hopefully you want to keep the letters going and you can keep updating me on . . . how your whole situation is going. How do you feel? I want to help at least just by being friends, or just being here for you. And I think it sucks that I don't get to see you well I get to see you through a camera. What the hell is that? That just makes me hella angry! I wanted to be able to touch you and hug you. I guess not going to happen. Well Ricky write back please and once you see who I am you'll probably want to keep in touch. Wish you the best of luck!

Love, Jasmin

ECF No. 14-18 (Exhibit 43), at 33. See also ECF No. 14-23 (Exhibit 48), at 8 (re: timing).

Ending that same day, Vincent and Vazquez had just been tried together on charges of conspiracy to commit murder and murder with the use of a deadly weapon.

The State sought to establish at the trial that Vincent and Vazquez killed Richard "Fly" Morris in the course of a robbery or attempted robbery.

Farin Estrada testified that she and Morris were at a mutual friend's house on the day of the homicide when he asked her to arrange a purchase of $50.00 of methamphetamine. She called Vincent to set up the deal. Vincent and Vazquez arrived in a two-door car. The four thereafter left together in the vehicle, with Vincent driving, Vazquez in the front passenger seat, Estrada sitting behind Vincent, and Morris sitting behind Vazquez.[2]

Apparently unbeknownst to anyone else in the car, Morris was carrying a .40 caliber Glock semiautomatic handgun in a waist holster.[3]

According to Estrada's trial testimony, as she was about to get into the car on the driver's side, Vincent asked her "Do you want to rob this guy?" She responded "okay."[4]

According to Estrada's testimony, after a short drive, Vincent stopped the car; Vincent and Vazquez turned around with semiautomatic handguns drawn; and Vincent told Morris to give him Morris' money. Morris reached for his waist, but he pulled out the Glock .40 rather

---

[2]ECF No. 14-6 (Exhibit 31), at 115-21 (Estrada); see also id., at 28-46 (Myron Wernicke).

[3]ECF No. 14-6, at 34-36, 40-41 & 45-46 (Wernicke); ECF No. 14-8 (Exhibit 33), at 158 (holster).

[4]ECF No. 14-6, at 120-21. Estrada initially told the police that there was no plan to rob Morris and that he pulled a weapon first. She was only 18 and a heavy meth addict at the time. Id., at 112-15 & 126-35.

-4-

than money.  Vincent and Vazquez then both opened fire on Morris.[5]

Vincent and Vazquez thereafter dumped Morris' body in the street before driving off, without taking his wallet with $110.00 inside, $50.00 in loose currency in his pocket, or his watch.  Morris' Glock fell to the street during the process, and Vazquez put it back in the car.[6]

According to Estrada's testimony, after they dropped Vazquez off, she accompanied Vincent to his mother's house.  At the house, Vincent pulled the magazine out of his handgun and said, with a bragging manner, that he had only two bullets left.[7]

Morris had gunshot wounds from six bullets that struck him in the head, neck, torso, and hand.  The wounds from four of the six gunshots independently would have been fatal. Two .32 caliber full metal jacketed bullets and one .380 caliber hollow point metal jacketed bullet were recovered from his body.[8]

The .380 caliber bullet recovered from Morris' body was fired from the Kel-Tec P-3AT .380 ACP semiautomatic handgun that Vazquez had in his possession at the time of his arrest.  This hollow point round produced one of the independently fatal wounds to Morris' torso, passing through multiple critical organs.[9]

The two .32 caliber bullets recovered from Morris' body, one of which produced a mortal wound to his head, and another recovered at the scene all were fired from the same weapon.  An additional .32 caliber round later recovered from Vazquez' hand also was fired from that same weapon.  Moreover, two .32 caliber ejected casings recovered from the car that Vincent had borrowed from his mother and the garage where it was kept were fired from

---

[5]ECF No. 14-6, at 120-24.

[6]ECF No. 14-6, at 48-64 (resident Chris Douglas); *id.*, at 85-87, 98 & 100-01 (belongings with body); *id.*, at 124-25 (Estrada regarding retrieval of the Glock); ECF No. 14-8, at 157-58 (currency on body); ECF No. 14-9, at 38-45 (resident Randall Rather).

[7]ECF No. 14-6, at 125-26.

[8]ECF No. 14-8, at 76-94 (forensic pathologist Dr. Gary Telgenhoff, M.D.); ECF No. 14-6, at 89-90 (crime scene investigator Monte Spoor); *id.*, at 143-45 (firearms and toolmark examiner James Krylo).

[9]ECF No. 14-8, at 83-86 (Dr. Telgenhoff); *id.*, at 175-78 (Detective Robert Rogers); ECF No. 14-6, at 139-45 (Krylo).

the same weapon as one another.  A recorded telephone call reflected that when Vincent's

mother later told him that the police were asking questions, he told her that he had destroyed

the gun.[10]

According to the opinions of the State's forensic examiners, all of the multiple bullet

defects in the car were caused by bullets fired from front to back in the car rather than vice

versa.  No expended bullets, of any caliber, were recovered from the vehicle.[11]

A towel with blood matching Morris' DNA also was recovered from Vincent's mother's

garage where the car was found.[12]

The State further introduced testimony from two young women that the State

maintained each separately had left town with the respective defendants subsequent to the

homicide, in different directions.

According to her trial testimony, Pamela Herman was a close friend of Vincent at the

time; but she denied that they were boyfriend and girlfriend.  Her independent recollection of

the events at the time and of the truthfulness or untruthfulness of her prior statements to the

police was spotty, due to her extensive methamphetamine use during that time period.  In a

September 2006 statement, she told the police that Vincent had been crying after the

shooting and that he told her that he acted in self-defense after Morris pulled a gun.  In a

November 2006 interview, based upon an investigator's notes and later report, she instead

told the police that Vincent had two guns after the shooting, that Vincent told her that "they"

were going to rob Morris, that he had his gun pointed at Morris and was taking his watch when

Morris drew his gun, that they left town to avoid the police, and that she had not been truthful

---

[10]ECF No. 14-6, at 78-79, 91-93 (Spoor); *id.*, at 143-44 & 145-49 (Krylo); ECF No. 14-8, at 27-28 (crime scene analyst supervisor Joseph Matvay); *id.*, at 81 (Dr. Telgenhoff); *id.*, at 94-106 (Vincent's mother); *id.*, at 165-66 (Rogers); ECF No. 14-9, at 33-34 & 36 (Rogers continuation).

[11]ECF No. 14-6, at 93-94 (Spoor); ECF No. 14-8, at 28-41 (Matvay); *id.*, at 99-101 (Vincent's mother).

[12]ECF No. 14-6, at 110-11 (DNA tech Kellie Gauthier); ECF No. 14-8, at 164-65 (Rogers).  Cellular phone records and cell tower location information further corroborated Estrada's testimony as to the drug buy call and Vincent's presence at the relevant scenes thereafter. E.g., *id.*, at 171-74 (Rogers).  Blood matching Morris' DNA also was present on Estrada's purse. E.g., ECF No. 14-6, at 106 (Gauthier); ECF No. 14-8, at 161 (Rogers).

in her September statement. At trial, she testified that they left town instead to spend some time together. As for her prior two statements she testified: "Neither of them were going to be very accurate because I was high on every one of them, extremely high." She further testified that she was afraid of being charged as an accessory after the fact at the time of the November statement.[13]

According to her trial testimony, Kelly Logan was Vazquez' girlfriend at the time; and they went to Barstow, California afterwards to seek treatment for a gunshot wound to his hand, with Vazquez using an assumed name. She otherwise had no independent recollection of the particulars that the State sought to elicit from her consistent with her prior grand jury testimony or even as to giving the testimony itself, once again due to heavy drug use at the time, including while testifying. In her grand jury testimony, she had testified that she had seen Vazquez with a black .380 or .38 gun, that he had said that he had been there to rob the victim of the shooting, and that a .40 caliber Glock was taken from the victim.[14]

During the trial, Vazquez' counsel focused on evidence and inferences reflecting an absence of proof that Vazquez had any prior knowledge of or involvement in any alleged robbery. This defense strategy tended to establish culpability, or at the very least a higher degree of culpability, instead on Vincent.

In Vazquez' opening statement, counsel maintained that "the evidence is going to show that . . . Farin Estrada set this entire thing up with Mr. Lee [Vincent], not my client," that other involved individuals did not even know Vazquez, that he was simply a passenger in the vehicle, and that he was just sitting there "when all hell broke loose" when Morris pulled a gun in response to Vincent and Estrada's robbery. (ECF No. 14-6, at 22-24.)

Thereafter, in cross-examining Farin Estrada, Vazquez' counsel elicited testimony multiple times as to her prior consistent deposition testimony emphasizing that she talked with

---

[13]ECF No. 14-8, at 42-65 (Herman); *id.*, at 67-75 (district attorney's office investigator Bill Falkner).

[14]ECF No. 14-8, at 138-52.

and agreed with Vincent and only Vincent regarding robbing Morris.[15]

In closing argument, Vazquez' counsel argued, *inter alia*, that: (1) even if the State's principal witness Farin Estrada was to be believed, the State had shown evidence only of a plan to rob Morris between Vincent and Estrada; (2) depending on which of the witnesses' statements the jury went by, either Morris or Vincent pulled a gun first; (3) then, "only when it became the OK Corral" and he "saw all hell's breaking loose," Vazquez, who had been along only as a passenger, pulled out his gun and start firing either in the heat of passion or in self-defense; and (4) only one bullet from Vazquez' weapon was found in Morris' body, but he was hit by six bullets. Counsel maintained that there was more than a reasonable doubt as to what actually happened in the car, given the multiple inconsistent statements by multiple witnesses who then all were heavy drug addicts and thus were prone to say anything at any particular time to stay out of custody and keep using drugs.[16]

The jury returned verdicts acquitting both defendants of conspiracy to commit murder, finding only Vincent guilty of first-degree murder with the use of a deadly weapon, and finding Vazquez guilty instead only of second-degree murder with the use of a deadly weapon.[17]

Approximately three hours after these verdicts, juror Marnie Ramirez attempted to visit Vazquez in custody; and that same evening, she wrote him under an alias expressing her desire to, *inter alia*, help him with "anything you think I can help you with."[18]

Thereafter, on November 3, 2008, Vincent filed a motion for a new trial renewing his pretrial and trial arguments on his motion to sever the trials against the two defendants. The motion was not based upon any issues with regard to juror Ramirez, and it does not reflect

---

[15]ECF No. 14-6, at 130-31 & 133. Vazquez' counsel additionally elicited testimony, *inter alia*: (1) from Myron Wernicke (the mutual friend of Estrada and Morris) emphasizing that Vincent was in the driver's seat, that Wernicke did not know Vazquez, and that Wernicke did not want Vincent around because of a prior incident; and (2) that a witness saw only the driver laughing as the car was leaving the scene where Morris' body was dumped. See *id.*, at 41-43 & 47; ECF No. 14-9 (Exhibit 34), at 44-45.

[16]ECF No. 14-9, at 93-118.

[17]ECF Nos. 14-11 & 14-12.

[18]See text, *supra*, at 3-4.

any knowledge by Vincent's counsel of any situation regarding the juror.[19]

On November 5, 2008, Vazquez filed a motion for a new trial based on, *inter alia*, counsel having "learned that a juror visited Vazquez at the conclusion of his trial, and indicated that she had performed independent research about Vazquez during his trial." Vazquez sought an evidentiary hearing to have the juror examined under oath as to any research conducted and any disclosures made to other jurors.[20]

Neither defendant's motion affirmatively reflected notice to or service upon counsel for the other defendant as opposed to only on the district attorney.

The State's November 13, 2008, opposition to Vazquez' motion advised the court of the specifics of Ramirez' post-verdict correspondence and contact with Vazquez. The State attached copies of the October 24, 2008, correspondence quoted in full at the outset of this discussion, along with letters dated October 30, November 5, and November 7, 2008. The correspondence collectively reflected that Ramirez began visiting Vazquez in custody at the next available visitation date following the verdict, professed her romantic attraction to him, indicated her wish to be at his sentencing, and repeated her desire to help and support him in any way that she could. While opposing a new trial on the showing then made by Vazquez, the State concurred as to the need for a limited evidentiary hearing to inquire of Ramirez/Rosales as to her conduct during and after the trial.[21]

The State's opposition affirmatively reflected fax service only on counsel for Vazquez.[22]

An on-the-record proceeding of a preliminary nature was held on November 18, 2008. The State noted a press report quoting the juror as saying that she had been a holdout for voluntary manslaughter, which the State suggested then led to a compromise verdict. The

---

[19]ECF No. 14-14 (Exhibit 39).

[20]ECF No. 14-15 (Exhibit 40).

[21]ECF No. 14-18 (Exhibit 43), at 2-4, 33-34, 36-38, 40-41 & 43-45.

[22]*Id.*, at 8.

matter was set down for an evidentiary hearing.[23]

Vincent and his counsel were not present for the November 18, 2008, proceeding; and there is no affirmative indication in the record that Vincent's counsel had been notified prior to the proceeding.  The first affirmative record indication that Vincent's counsel had been made aware of and/or was present at proceedings on the juror-misconduct issue consisted of a later impromptu November 25, 2008, proceeding with regard to Vazquez obtaining videos of Ramirez' visitations of Vazquez in custody.[24]

The matter came on for an evidentiary hearing on December 1, 2008.  Marnie Ramirez testified, *inter alia*, that: (1) she had not looked at Vazquez' MySpace page until after the verdict on October 24, 2008; (2) she wrote the first letter that night; (3) she visited Vazquez three times following the verdict; (4) she had not talked with him on the telephone; and (5) she did not write, visit, talk on the telephone with, or otherwise communicate with Vazquez, directly or indirectly through a third party, at any time prior to the verdict.[25]

Vazquez' counsel submitted the matter without argument.  No party argued juror bias at the hearing.  The State argued that Vazquez had failed to show that extrinsic evidence had intruded on the deliberative process and that Vazquez thus had not met his burden.[26]

The state district court concurred with the State's argument:

> THE COURT: Yeah, I mean, I agree with the State.  The critical inquiry is whether or not there was any misconduct prior to the verdict or whether or not a juror received any information outside the evidence that was presented during the trial.
>
> The juror indicates that she did not look at the MySpace page until after the verdict had been rendered in this case.  She further indicated that she did not write to the defendant or contact him at the detention center until after the verdict.

---

[23]ECF No. 14-21 (Exhibit 46).  See also ECF Nos. 33-8 & 33-9 (Exhibits 96 & 97)(11/14/08 press report).  Exhibits 96 and 97 appear to be the same report, although they are listed as being from two dates.

[24]ECF No. 13-7 (Exhibit 6), at 39 (state district court minutes).

[25]ECF No. 14-23 (Exhibit 48), at 5-13.

[26]*Id.*, at 12-13.

> Once the verdict is rendered, the juror is free to do as she wishes. And so since she did not commit any misconduct or do anything prior to the verdict, I don't see a ground for a new trial on that basis.

ECF No. 14-23, at 14.

After briefly discussing the other ground of Vazquez' motion, as to which the court had ruled previously, the court asked Vincent's counsel whether he had anything else on the preceding proceedings before addressing Vincent's motion for new trial.[27]

Counsel responded in the following exchange:

> MR. HARTSELL: The only thing is, Your Honor, I've never received copies of the letters from the juror. I don't have any of that information. So I'd reserve –
>
> MR. STANTON [for the State]: I'll e-mail them to him today.
>
> THE COURT: All right.
>
> MR. HARTSELL: So my investigator can look into that.
>
> THE COURT: All right.
>
> MR. HARTSELL: And that's why I did not raise any issues during that part. No, Your Honor, I'll submit my motion for a new trial.

ECF No. 14-23, at 15.[28]

Vincent thereafter sought no relief from the state district court at any time prior to the direct appeal based upon Ramirez' post-verdict communications with Vazquez.

Accordingly, prior to the direct appeal, the state district court never was presented with any request whatsoever by Vincent for relief in any respect concerning juror Marnie Ramirez. Nor was the court presented with any testimony or argument – by any party – seeking to call Ramirez' impartiality into question during the jury's deliberations prior to the verdict, assuming

---

[27]ECF No. 14-23, at 14-15.

[28]Counsel was referring to Vincent's motion for a new trial based upon the failure to sever the defendants, which the court denied for reasons previously discussed before and during trial.

that such testimony even could have been pursued under applicable evidentiary rules.[29]  The only issue argued to the district court – by Vazquez and not Vincent – concerned alleged improper research and/or contact prior to the verdict, and that argument was not borne out factually by the evidence.

At sentencing, the State argued for a 10 to life rather than 10 to 25 year sentence for Vazquez.  In that argument, the prosecutor stated:

> . . . .  To begin with, he is the beneficiary of what – obviously, this Court now has heard through an evidentiary hearing and from the verdict and the facts of this case, conduct by a juror, which is, frankly, outrageous, and the fact – and for the record, that same juror is in the courtroom today.  I find her presence here, while not unlawful, offensive to the State and certainly offensive to the victim's family.  And I certainly want the record to be clear for purposes of appellate review of her presence here today.
>
> He has received the benefit of what clearly was a violation of a – or a juror's oath.  And that is all the benefit that he should receive because in the eyes of not only the law, but in the facts introduced at this trial, they are both liable for first degree murder.

ECF No. 14-25 (Exhibit 50), at 8-9.

Vincent's counsel echoed this theme, in reverse, in urging that fairness dictated instead that Vincent should get a similar alleged break via the court's sentence:

> . . . .  And then I would ask the Court to address the fairness.  The State says codefendants, same crime.  Well, I think the Court should treat this as the same crime, and because of the way the trial played out and the potential problem with the juror, one defendant is getting the benefit and he's going to get the chance of parole.
>
> . . . . .
>
> And then this whole juror issue.  I've never seen that before, and as the State said, the codefendant got the benefit of that.  Lee [Vincent] didn't get the benefit of that.
>
> So we had inconsistent verdicts with what the Court heard happen, two separate caliber bullets in the victim.  So if the Court sees the same culpability, then the only way to make this fair is to render the sentencing as close as possible, and that would be

---

[29] *See* N.R.S. 50.065(2)(a). See also text, *infra*, at 24-25 & 33 (discussing no-impeachment rule).

1    to give Lee a chance at parole.

2    ECF No. 14-25, at 11-12.[30]

3        In sentencing Vazquez, the state district court opened with these remarks:

> THE COURT: All right. At least to some extent, Mr. Vazquez had the benefit of a bizarre infatuation by one of the jurors. To the extent of that –
>
> I'm glad you think it's funny, Mr. Vazquez.
>
> To the extent that impacted the verdict, we don't know. But in my view, Mr. Vazquez is a 100 percent as culpable as Mr. Vincent in this matter, and he should, in my view, be sentenced as a first degree murderer. I don't have the power to do that, so I am going to impose the maximum penalty allowed by law as to second degree murder.

11   ECF No. 14-25, at 21.

12       These comments by counsel and the court notwithstanding, no relief was sought by Vincent thereafter in the state district court with regard to juror Marnie Ramirez. No argument was made in the district court that the impressions of counsel – and even of the state district court – as to what they believed may have transpired during jury deliberations provided a legally valid basis for setting aside Vincent's verdict, conviction and sentence with no showing of actual improper conduct or extraneous contact during deliberations.

18       On direct appeal, Vincent argued – for the first time – that his motion for a new trial "should have also been granted based on the **unusual** (emphasis added) circumstance regarding" juror Marnie Ramirez. Vincent maintained that "it was clear that an issue of bias existed on the part of the juror and would explain, in part, the differing verdicts, and was another reason the trial should have been severed."[31] Petitioner presented this argument despite not having sought relief on his motion on that basis in the district court.

24       In a February 3, 2010, order, the Supreme Court of Nevada rejected the claim

---

[30]But cf. *id.*, at 16-17 (Vazquez' counsel suggested that more than one juror was holding out over voluntary manslaughter, precipitating a debate with the State as to whether such a matter impermissibly intruded into the jury's deliberations).

[31]ECF No. 15-5 (Exhibit 55), at 26-27 (emphasis and parenthetical in original).

-13-

presented to that court on the direct appeal on the following basis:

> . . . [A]ppellant argues that the district court erred by denying his motion for new trial based on the same grounds identified above [regarding his pretrial motion to sever] and due to a juror's contact with his codefendant after trial. As explained above, appellant fails to show that joinder was improper. As to juror misconduct, the district court denied appellant's motion because the juror's contact with appellant's codefendant occurred after the jury rendered its verdict. Accordingly, we conclude that the district court did not abuse its discretion in this regard. See Domingues v. State, 112 Nev. 683, 695, 917 P.2d 1364, 1373 (1996) (providing that a district court's decision on a motion for new trial "will not be disturbed on appeal absent palpable abuse").

ECF No. 15-9 (Exhibit 60), at 2.

Thereafter, on state post-conviction review, petitioner pursued, *inter alia*, a claim that he was denied rights to an impartial jury, a fair trial, and due process due to juror bias because juror Marnie Ramirez had developed a romantic attraction to Vazquez during trial.

At a state post-conviction evidentiary hearing, Ramirez testified, *inter alia*, that: (1) she was 19 or 20 when she sat on the jury;[32] (2) she abided by her oath and followed the court's instructions throughout the trial;[33] (3) she had no contact with Vazquez at any time prior to the verdict;[34] (4) nothing occurred between her and Vazquez that affected her ability to be a fair and impartial juror;[35] (5) she did not ever inform the court about any feelings as to Vazquez during the trial or deliberations "because during that time I had no feelings;"[36] (6) she initially attempted to visit and wrote to Vazquez on October 24, 2008, because "I was, like, curious to know more about it, what actually had happened because maybe he could have just told

---

[32]ECF No. 26-14 (Exhibit 78), at 25.

[33]*Id.,* at 30 & 33-34.

[34]*Id.,* at 36.

[35]*Id.* ("No, absolutely not.").

[36]*Id.,* at 30.

-14-

me the whole story, you know;[37] (7) when she spoke of help and support, she meant emotional support;[38] (8) when she signed "Love, Jasmin" that was "just what you write at the end of every letter," "I say it to a lot of people . . . like my family members or my friends, you know," but "[i]t's not like . . . I'm in love with you;"[39] (9) she went further than that with the sexual innuendo "but I knew it wasn't gonna happen because I wasn't gonna go to that extent" "[s]o writing would be one thing, but actually putting it into action and doing it would be another thing;"[40] (10) she corresponded with and talked on the telephone with Vazquez very frequently while he was in local custody, including one or twice daily on the phone;[41] (11) she corresponded with and talked on the telephone with Vazquez less frequently but still frequently while he was in prison, speaking with him only one or twice a week by phone;[42] (12) she visited him when he was in local custody but never at prison;[43] (13) she broke it off in 2009 because she had become "just tired of all the stuff" and "problems at home" with her husband over the relationship;[44] and (14) she told Vazquez at that time that "this was a big mistake since the beginning and I didn't want to keep having problems at home because of this so I didn't want to talk to him any more."[45]

The state district court made oral findings, *inter alia*, that: (1) there was no evidence that anything improper occurred either during the trial or deliberations; (2) Ramirez "was

---

[37]ECF No. 26-14, at 30.

[38]*Id.,* at 18, 24 & 32.

[39]*Id.,* at 27-28.

[40]*Id.,* at 28.

[41]*Id.,* at 16-19.

[42]*Id.*

[43]E.g., *id.*, at 15.

[44]*Id.*, at 15-16.

[45]*Id.*, at 23.

young . . . maybe naive;" (3) while her feelings "didn't just kind of crop up following [the] verdict," there was no evidence that her "crush" or "infatuation" caused her to violate her oath as a juror "in any way against either Mr. Vazquez or Mr. Vincent;" (4) "[t]here was no bias at the outset" when she was seated as a juror; and (5) "[s]he is a young woman, and I think that . . . everything suggests that crush, which probably related a lot to the fact that she wasn't very mature, developed during the course of the proceedings and that she didn't violate her oath . . . either in the trial phase or through the deliberative process."[46]

The state district court's written findings substantially tracked the findings made orally from the bench.[47]

On July 23, 2013, the Supreme Court of Nevada affirmed the denial of state post-conviction relief.

On a related ineffective-assistance claim discussed *infra*, the state supreme court found that there was a "lack of evidence that the juror was biased or acted improperly during appellant's trial." The court noted that Ramirez "testified that the romantic relationship between her and [Vincent's] codefendant did not begin until after the trial," and that "[s]he also stated that she had no bias against [Vincent] and had followed her oath and all of the court's instructions while acting as a juror."[48]

The court rejected the current substantive claim as presented to that court on the following basis:

> . . . [A]ppellant argues that the trial court erred in denying his motions for severance and a motion for new trial based on the juror's after-trial relationship with the codefendant.[FN1] These issues were considered and rejected on direct appeal. *Vincent v. State*, Docket No.

---

[46]ECF No. 26-14, at 40-41 & 45-46. See also ECF No. 26-13 (Exhibit 77), at 17-37 (the court and counsel engaged in an extended discussion of the ramifications of the issue during a prior hearing, with the court making the point, *inter alia*, that there was no indication of a preexisting bias and thus no indication that – as in the few prior related cases – the juror had lied during *voir dire* about a preexisting bias).

[47]ECF No. 26-16 (Exhibit 80), at 6.

[48]ECF No. 26-23 (Exhibit 87), at 3.

53288 (Order of Affirmance, February 3, 2010). The doctrine of law of the case prevents further litigation of these issues and "cannot be avoided by a more detailed and precisely focused argument." *Hall v. State*, 91 Nev. 314, 316, 535 P.2d 797, 799 (1975). Therefore, the district court did not err in denying these claims.

> [FN1] The State asserts that appellant abandoned these issues because they were not discussed at the evidentiary hearing. However, appellant did not specifically abandon these issues in the proceedings before the district court, and therefore, it is appropriate for this court to consider them on appeal.

ECF No. 26-23, at 6-7.

Turning now to disposition of the claims in this Court, respondents have raised no procedural default defense to Ground 1 following upon the state supreme court's decision on state post-conviction review. There thus is no dispute that the federal constitutional claims are properly before the Court for disposition on the merits on federal habeas review. *Cf. Cone v. Bell*, 556 U.S. 449, 466-68 (2009)(rejection of a claim under the law of the case doctrine as applied by the state court did not give rise to a procedural default precluding federal habeas review on the merits).

Against that backdrop, both respondents and petitioner, argue Ground 1 under AEDPA's deferential standard of review.[49]

Applying that standard of review, the Court holds that the state courts' rejection of the federal constitutional claims in Ground1 withstands review under § 2254(d).

The Court is not persuaded by petitioner's argument that the state courts' rejection of the claim was based upon an unreasonable determination of fact in light of the evidence presented in the state court proceedings.

No party – including especially Vincent – sought to demonstrate at the evidentiary hearing on the post-trial motions for new trial that juror Ramirez was biased against Vincent

---

[49]Petitioner appears to perhaps make a passing argument instead for application of *de novo* review that the Court discusses, *infra*, in n. 57. See ECF No. 47, at 17, line 1.

during deliberations, whether in light of her post-verdict activities or otherwise. Given that bare record, a decision rejecting Vincent's late-breaking bias claim on direct appeal was not based upon an unreasonable determination of fact. The evidentiary hearing evidence ruled out improper conduct or contact prior to the verdict; and bias during deliberations otherwise was not even raised or pursued, much less established, in the record before the state district court on the motions for new trial.

When bias actually was raised in the state district court as a basis for overturning the verdict against Vincent on state post-conviction review, the court fully explored the matter in another evidentiary hearing. The district court's finding that juror Ramirez developed an attraction for Vazquez prior to deliberations but that it did not keep her from being impartial during deliberations was not an unreasonable determination of fact. Ramirez' testimony at the hearing reflected an impulsive and somewhat superficial then very young adult who exhibited poor judgement following the verdict, but at a time when she in fact had been released from the restrictions placed on her during trial. While her post-verdict communications to Vazquez perhaps suggested more than a mere passing or superficial attraction, it would not be the first time in the annals of humankind that someone professed more than they actually felt, or in truth intended to actually deliver.[50]

On such a record, this Court cannot say that "an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor, supra*.

Petitioner nonetheless urges that the state district court's finding is unreasonable because the court found that the crush, infatuation, or attraction "didn't just kind of crop up following [the] verdict." However, the court clearly went on to find that the attraction did not cause Ramirez to violate her oath as a juror in any way against either defendant, which given the, *inter alia*, superficiality reflected in Ramirez' hearing testimony, was not an unreasonable determination of fact. Short of a legal holding that any time that a juror becomes attracted to

---

[50]See text, *supra*, at 14-15.

a trial participant they become *per se* biased under the Sixth Amendment – which as is discussed *infra* the law does not support – the district court's very clear and very specific finding was not an unreasonable determination of fact on the record before that court.

Petitioner further urges that the state district court's finding following the March 19, 2012, post-conviction evidentiary hearing was unreasonable because the court had indicated at the January 13, 2009, sentencing that "[a]t least to some extent, Mr. Vazquez had the benefit of a bizarre infatuation" by Ramirez. As the Ninth Circuit has stated in a related context, "[f]ederal habeas courts enforce reasonableness, not concordance." *Williams v. Johnson*, 840 F.3d 1006, 1011 (9th Cir. 2016), *cert. denied*, 137 S.Ct. 1344 (2017). The state district court also stated immediately thereafter at the sentencing that "[t]o the extent that impacted the verdict, we don't know," in part because no claim of bias during deliberations had been made at that point as a basis for challenging a verdict. When the district court later was called upon to make such a determination, upon a more complete factual record, the court reached the findings outlined above. AEDPA does not put this Court in the role of enforcing a superficial consistency between district court statements made years apart in different contexts and on different records.[51]

Petitioner accordingly has not demonstrated that the state courts' rejection of the claims in Ground 1 was based upon an unreasonable determination of fact in light of the evidence presented in the state court proceedings.

Nor has petitioner demonstrated that the state court rejection of the claims, premised upon such findings, was either contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

The right to trial "by an impartial jury of the State and district wherein the crime shall have been committed" is guaranteed directly by the text of the Sixth Amendment.

However, as recently as 2016, the Ninth Circuit noted the sparsity of controlling Supreme Court precedent establishing what constitutes constitutionally cognizable bias on

---

[51]What the lawyers said at sentencing was not evidence of anything and has even less relevance.

-19-

the part of a juror:

> Supreme Court case law in the area of juror bias is sparse. Although we know that biased jurors may be dismissed from deliberations without offending the Constitution, we don't know precisely what it means for a juror to be biased. *See United States v. Wood*, 299 U.S. 123, 146, 57 S.Ct. 177, 81 L.Ed. 78 (1936) (noting that "the Constitution lays down no particular tests" for juror bias). However, we do know that a juror is biased if he is unwilling to follow the law. *See Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (noting that jurors lacking impartiality may be excused as biased and defining an impartial juror as one "who will conscientiously apply the law"); *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (defining an "impartial juror" as one who "can lay aside his impression or opinion and render a verdict based on the evidence").

*Williams*, 840 F.3d at 1010 (in context of challenge to the disqualification of a juror for bias).

Supreme Court precedent does establish that the remedy – when a claim of juror partiality actually is raised – "is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215-16 (1982).

In the original criminal proceedings in the state district court, neither defendant sought a new trial based on juror partiality due to emotional attachment – with only Vazquez seeking to establish juror misconduct through alleged independent research by the juror. When the juror's testimony did not support that claim, neither defendant pursued any further evidentiary record with regard to the juror – despite the clear opportunity to do so.[52]

When Vincent later did challenge his verdict while in the state district court based on a claim of juror bias on state post-conviction review, the court did in fact hold a hearing and made the findings regarding alleged bias discussed above. When such a hearing is held, and subject to review of the factual findings under § 2254(d)(2) and/or (e)(1), "[t]he opportunity to show actual bias is a sufficient remedy and a "'guarantee of a defendant's right to an impartial jury.'" *Fields v. Bowen*, 503 F.3d 755, 773 (9th Cir. 2007)(*en banc*)(quoting *Phillips, supra*, in turn quoting further prior authority). Under clearly established federal law, when the issue is actual bias (as opposed to implied bias discussed *infra*), the testimony of the juror is

---

[52]See text, *supra*, at 11.

competent evidence as to her impartiality. *E.g., Phillips*, 455 U.S. at 215; *Fields*, 503 F.3d at 774 n.11. Given that the state court factual finding that juror Ramirez remained impartial during the deliberations as to Vincent withstands review under § 2254(d)(2), petitioner fails to present a viable Sixth Amendment claim based upon actual bias, under governing United States Supreme Court precedent.[53]

Petitioner further contends, however, that Ramirez' attraction for Vazquez establishes implied bias, *i.e.*, bias conclusively presumed as a matter of law without any showing of actual bias and despite any juror testimony as to impartiality. *See generally Phillips*, 455 U. S. at 221-24 (O'Connor, J., concurring). The difficulty for petitioner under AEDPA in this regard, however, is that "the Supreme Court has not explicitly adopted (or rejected) the doctrine of implied bias." *Fields*, 503 F.3d at 768.[54] Nor has the Supreme Court extended any such doctrine of implied bias to an alleged one-sided romantic attraction arising during trial, with no improper contact or conduct during the trial, no concealed preexisting relationship, and thus no dishonesty about such a preexisting connection during *voir dire*.[55] And the Supreme Court in particular had not done so at the time of the 2010 and 2013 decisions of the Supreme Court of Nevada in this case. "Clearly established federal law" under § 2254(d)(1) includes only the Supreme Court's decisions as of the time of the relevant state-court adjudication on the merits. *Greene v. Fisher*, 565 U.S. 34 (2011). It is not an unreasonable application of clearly established federal law to decline to apply a specific legal rule that has not been squarely established by the Supreme Court or to decline to extend the rationale of

---

[53]*See also Dyer v. Calderon*, 151 F.3d 970, 974-75 (9th Cir. 1998)(*en banc*)(so long as the trial court's investigation is reasonably calculated to resolve the doubts raised about the juror's impartiality, the findings based on that investigation are entitled to a presumption of correctness). The district court in this matter provided a full opportunity to challenge the juror's conduct and partiality at both the 2008 and 2012 hearings.

[54]*See also Dyer*, 151 F.3d at 979 n.12 (noting that the Ninth Circuit had not yet decided whether under circuit law dishonesty during *voir dire* was a necessary predicate to a finding of implied bias). AEDPA did not apply in either *Fields* or *Dyer*. *Fields*, 503 F.3d at 763; *Dyer*, 151 F.3d at 973 n.3.

[55]For example, petitioner relies upon examples of implied bias – from circuit rather than Supreme Court authority – that involved circumstances or relationships existing prior to *voir dire*. See ECF No. 47, at 17. Justice O'Connor's concurring opinion in *Phillips* also gives examples exclusively involving preexisting circumstances or relationships. *See* 455 U.S. at 222.

1   its precedents to a new context.  *E.g., White v. Woodall* 134 S.Ct. 1697, 1706 (2014);

2   *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009).[56]

3       Indeed, in a somewhat analogous situation arising in a federal criminal trial, the Ninth

4   Circuit not only did not find a basis for bias, but affirmed without the requirement of an

5   evidentiary hearing, when a juror wrote to a prosecution witness after the trial reflecting his

6   attraction for and desire to meet the witness.  *See United States v. Smith*, 424 F.3d 992,

7   1011-13 (9th Cir. 2005).   The Court of Appeal concluded:

8               The district court did not abuse its discretion in denying the
9           evidentiary hearing and a new trial.   Even if this juror had
            something of a crush on Agent O'Keeffe, his letter made clear
            that he diligently performed his duty as a juror, never speaking to
10          Agent O'Keeffe during the trial, and at most exchanging a smile
            with her.   It is unlikely that any trial goes by without one juror
11          finding one witness nice or attractive.   The only unusual thing
            about this case is that Juror # 9 put his feelings in writing.   The
12          district court was well within its discretion in finding no evidence
            of juror misconduct and no extraneous influences on the juror,
13          such that an evidentiary hearing was not required.

14  424 F.3d at 1013.

15      Petitioner thus cannot establish that the state supreme court's implicit rejection of a

16  federal constitutional claim based upon implied bias was either contrary to or an unreasonable

17  application of clearly established federal law.[57]

18  _____

19      [56] *See also Turner v. McEwen*, 819 F.3d 1171, 1176-78 (9th Cir. 2016)(the state court's rejection of a
20  claim that the jury's verdict was tainted by the jurors' observation of a woman in the gallery who allegedly was
    directing a witness' testimony by shaking her head withstood review under AEDPA where cases such as *Irvin
21  v. Dowd*, also relied upon by the petitioner herein, did not establish a sufficiently specific rule to determine the
    outcome of the issue).

22      [57] Petitioner suggests that the state supreme court failed to follow Nevada implied-bias precedent, but
23  any such *arguendo* failure to follow or properly apply Nevada state precedent does not present a cognizable
    matter on federal habeas review.

24      Petitioner further contends that Ground 1 is subject to *de novo* review because the state courts
25  allegedly failed to apply the relevant standards.   ECF No. 47, at 17, lines 1-2.   Petitioner thus appears to be
    suggesting that the Court should dispense with the Congressionally-required deferential review under AEDPA
26  (a) as to a legal doctrine not yet adopted by the Supreme Court, (b) as extended to an area not contemplated
    even in the Supreme Court's nascent discussions of the issue to date, (c) for a failure to comply with an
27  articulation requirement not imposed by any apposite high court precedent and (d) on a point not argued on
    direct appeal.   The Court is not persuaded.   "There is no text in [AEDPA] requiring a statement of reasons,"
28                                                                          (continued...)

Ground 1 therefore does not provide a viable basis for relief under AEDPA's deferential standard of review.[58]

The Court in any event would deny relief even on a *de novo* review.[59]

---

[57](...continued)
and a state court need not cite or even be aware of the Supreme Court's precedents so long as neither the reasoning nor the result of its decision contradicts them. *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

[58]*Accord Payne v. McGrath*, 2011 WL 6084304, No. 10-16813 (9th Cir., Dec. 7, 2011)(denying relief under AEDPA where detective who was a key witness for the state became romantically involved with a juror after trial). There additionally is a prior unpublished 2002 Ninth Circuit case denying relief where a juror was sexually attracted to both the defendant and her daughter and developed a "torrid romance . . . .principally on paper" with the defendant after trial, after testifying for her at her sentencing. The case cannot be cited under local circuit rules, however.

[59]When the state courts reject a purely state law claim on direct appeal on the merits and later reject a related federal claim under the law of the case, with no procedural default, the federal claim has not been adjudicated on the merits; and review of the federal claim thus is *de novo*. *Cone v. Bell*, 556 U.S. at 472.

In the present case, the Court has not previously had the need to determine whether the federal constitutional claims in Ground 1 were exhausted on direct appeal. When the Court had occasion to consider exhaustion on the prior motion to stay, it held only that "at the very least Ground 2 is exhausted." (ECF No. 23, at 4.) Respondents challenged the exhaustion of all claims, including Ground 1, in their opposition to the motion to stay, prior to the state post-conviction proceedings. Thereafter, in the answer filed following the state post-conviction proceedings, respondents referred to "this claim" as having been raised on direct appeal *but* respondents maintained that "the claim" was not "federalized" – i.e., federal constitutional claims were not asserted – until state post-conviction review. (ECF No. 42, at 4-5.) Respondents thus have consistently maintained that the *federal constitutional* claims in Ground 1 were not exhausted on direct appeal.

Even if the Court were to initially assume *arguendo* that petitioner exhausted the federal due process and fair trial claims in Ground 1 on direct appeal, he arguably did not then exhaust a claim that he was denied a right to an impartial jury in violation of the Sixth Amendment. Accordingly, the principal constitutional claim in Ground 1 arguably was not exhausted on direct appeal. Nor, in truth, did the due process and fair trial claims appear to be exhausted in the corresponding direct appeal argument. (See ECF No. 15-4 (Exhibit 55), at 26-27. The circumstances identified to establish exhaustion as to Ground 2 in the Court's prior ruling do not appear to extend to Ground 1. See ECF No. 23, at 4-6.)

The federal constitutional claims in Ground 1 thus arguably were not exhausted on direct appeal, arguably were neither procedurally defaulted nor decided on the merits on the state post-conviction appeal, and accordingly arguably are subject to *de novo* review on federal habeas review. *Cone v. Bell, supra*. The Ninth Circuit held in *Amado v. Gonzalez*, 758 F.3d 1119 (9th Cir. 2013), that the reviewing habeas court is obligated to apply the correct standard of review and that the issue is non-waivable. *See* 758 F.3d at 1133 n.9. *Amado* concerned a situation where neither party addressed the correct standard of review, and the court *sua sponte* applied AEDPA's deferential standard of review as the correct standard. The rationale of *Amado* would appear to apply as well, however, to the reverse situation where the parties apply the AEDPA standard of review to a claim that instead should be reviewed *de novo*. In the final analysis, the reviewing court has the obligation to apply the correct standard of review, whether deferential review or *de novo* review. *See also Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010)(courts may deny habeas relief by engaging in *de*
(continued...)

Even on a *de novo* review, the state district court's factual findings as to actual bias still are presumed correct under § 2254(e)(1) unless rebutted by clear and convincing evidence. *E.g., Phillips*, 455 U.S. at 218. For substantially the reasons discussed previously as to § 2254(d)(2), petitioner has not overcome the presumption of correctness accorded to the findings made by the district court on post-conviction review.[60] Given those presumptively correct findings, petitioner has not established actual bias even on a *de novo* review.

Turning to implied bias, the Court holds that such conclusively presumed bias cannot be established as a matter of law based on evidence solely of a juror's one-sided romantic attraction arising during trial, with no improper contact or conduct during the trial, no concealed preexisting relationship, and thus no dishonesty about such a preexisting connection during *voir dire*.

As the Supreme Court observed in *Phillips*:

> . . . [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in [prior authority] and held in this case.

455 U.S. at 217.

Indeed, potentially impeaching a jury verdict as a matter of law based upon an alleged emotional state of a juror arising during trial – with no improper conduct or contact and no prior relationship – would tend to contravene substantial policy considerations that support the no-impeachment rule with regard to jury deliberations. Under Federal Rule of Evidence

---

[59](...continued)
*novo* review when it is unclear whether AEDPA deference applies, because relief also would be unavailable under AEDPA if the writ is denied on *de novo* review).

[60]See text, *supra*, at 15-16 & 17-19.

-24-

606(b)(1), for example, a juror is not competent to testify as to "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict."[61]  The Supreme Court held this most recent Term that the no-impeachment rule must give way when it is alleged that a juror made explicit statements indicating that racial animus was a significant motivating factor in the juror's vote to convict.  *Peña-Rodriguez v. Colorado*, 137 S.Ct. 855 (2017).  In so doing, however, the Court reaffirmed the otherwise broad applicability of the no-impeachment rule and its underlying policy considerations:

> The Court noted [in *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987)] that "[s]ubstantial policy considerations support the common-law rule against the admission of jury testimony to impeach a verdict." *Id.*, at 119, 107 S.Ct. 2739.  While there is "little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior," the Court observed, it is "not at all clear ... that the jury system could survive such efforts to perfect it." *Id.*, at 120, 107 S.Ct. 2739.  Allowing such post-verdict inquiries would "seriously disrupt the finality of the process." *Ibid*. It would also undermine "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople." *Id.*, at 120–121, 107 S.Ct. 2739.

137 S.Ct. at 878; *see also id.*, at 868 (under headnote 10).[62]

---

[61]Nevada state law similarly bars inquiry "concerning the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith."  N.R.S. 50.065(2)(a).

[62]The *Peña-Rodriguez* opinion described the background facts in *Tanner* as follows:

> The *Tanner* petitioners were convicted of committing mail fraud and conspiring to defraud the United States. 483 U.S., at 109–110, 112–113, 107 S.Ct. 2739. After the trial, two jurors came forward with disturbing stories of juror misconduct. One claimed that several jurors "consumed alcohol during lunch breaks ... causing them to sleep through the afternoons." *Id.*, at 113, 107 S.Ct. 2739.  The second added that jurors also smoked marijuana and ingested cocaine during the trial. Id., at 115–116, 107 S.Ct. 2739.  This Court held that evidence of this bacchanalia could properly be excluded under Rule 606(b). *Id.*, at 127, 107 S.Ct. 2739.

(continued...)

-25-

Conclusively implying bias based purely upon an emotional state of a juror arising during trial – where strong and longstanding policy concerns otherwise bar examination of jurors as to such matters – would not be sound policy. The matter is better addressed, as it was by the state district court in this case, through an appropriate inquiry into whether the surrounding circumstances – such as improper conduct or contact during trial – give rise to either actual bias or a potentially viable basis for implied bias, such as there having been an actual prior relationship that was concealed during *voir dire*.

The Court therefore holds, in the alternative on a *de novo* review, that petitioner has demonstrated neither actual bias nor a viable basis for implied bias.

The Court accordingly holds that Ground 1 does not provide a basis for federal habeas relief. Reasonable jurists could find this conclusion to be at least debatable, however; and the Court therefore will grant a certificate of appealability as to this ground.

### Ground 2: Joinder of Defendants

In Ground 2, petitioner alleges that he was denied rights to due process and a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments when the state trial court did not sever his trial from that of his codefendant Vazquez.

The Supreme Court of Nevada rejected the claim presented to that court in its February 3, 2010, decision on direct appeal on the following basis:

---

[62](...continued)
137 S.Ct. at 878.

Notably, in *United States v. Smith*, *supra*, the Ninth Circuit held that Rule 606(b) barred examination of a juror as to the impact during trial of the juror's admitted infatuation with a prosecution witness:

> . . . . Thus, even if the juror's thought process was biased with his alleged "infatuation" with Agent O'Keeffe, the court was not free to hear evidence in this regard. Further, it was clear from Juror # 9's letter that there was neither extraneous prejudicial information from Agent O'Keeffe (a smile can hardly be so deemed), nor "outside influence [that] was improperly brought to bear."

424 F.3d at 1013. Rule 606(b) also governs the evidence that may be considered on federal habeas review. *See, e.g., Anderson v. Terhune*, 2011 WL 148912, No. 09-17566, at **4 (9th Cir., Jan. 18, 2011).

> . . . [A]ppellant contends that the district court erred by refusing to sever his trial from that of his codefendant on the grounds that his codefendant made inculpatory statements against him to the police, the defendants' defenses were antagonistic, and he was prejudiced by "spillover" effect and the disparity in the amount of evidence against each defendant. However, the codefendant's police statement was not admitted into evidence and appellant fails to adequately explain his remaining grounds or any resulting prejudice. Appellant also argues that joinder allowed the State and his codefendant to focus responsibility for the murder on him and that the cumulative effect of this circumstance caused undue prejudice. However, appellant's arguments do not show that any trial right was compromised or that the jury was prevented from making a reliable judgment as to guilt or innocence. See Chartier v. State, 124 Nev. ___, ___, 191 P.3d 1182, 1185 (2008); Marshall v. State, 118 Nev. 642, 648, 56 P.3d 376, 379 (2002). Because we conclude that appellant failed to demonstrate that the district court abused its discretion in this regard, we deny relief. Marshall, 116 Nev. at 647-48, 56 P.3d at 379.

ECF No. 15-9 (Exhibit 60), at 2-3.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

Petitioner relies upon, *inter alia*, *United States v. Lane*, 474 U.S. 438 (1986), and *Zaffiro v. United States*, 506 U.S. 534 (1993). Petitioner acknowledges that the Ninth Circuit held in *Collins v. Runnels*, 603 F.3d 1127 (9th Cir. 2010), that neither *Lane* nor *Zaffiro* establish a constitutional standard binding on the states. 603 F.3d 1132-33; *see also Runningeagle v. Ryan*, 686 F.3d 758, 776-77 (9th Cir. 2012)(neither *Lane* nor *Zaffiro* constitutes "'clearly established Federal law' sufficient to support a habeas challenge under § 2254). Petitioner nonetheless "respectfully suggests" that *Collins* was wrongly decided. While petitioner of course may seek to preserve the issue for a possible later request for, *inter alia*, *en banc* review on appeal, this Court remains bound by *Collins* and *Runningeagle* unless overturned by higher authority.[63]

---

[63] *See also Kansas v. Carr*, 136 S.Ct. 633, 645-46 (2016)(joint capital-sentencing proceeding did not violate due process, the defendants' argument as to antagonistic theories of mitigation notwithstanding). The state supreme court's decision on the merits of course is reviewed under AEDPA with regard to Supreme

(continued...)

Petitioner further urges that this Court review the state supreme court's decision as to Ground 2 because the state supreme court applied the rule in *Zaffiro*. He maintains that when the state court provides a reasoned decision, the federal court's review then is confined to the state supreme court's reasoning and the federal court may not consider some other hypothetical justification for the court's decision, such as whether the federal law allegedly applied by the state court is "clearly established federal law."

The Court is not persuaded. The fact that there is an absence of clearly established federal law on point is not "some other hypothetical justification" for the state court decision. That is part of the analysis required by the deferential standard of review under the controlling federal law in AEDPA. Whether the Supreme Court of Nevada correctly or incorrectly applied any federal criminal law cases that it followed is immaterial if those cases did not establish clearly established federal constitutional law binding on the states. Petitioner's circular argument is unpersuasive.[64]

Ground 2 does not provide a basis for federal habeas relief. Reasonable jurists would not find this conclusion debatable, and a certificate of appealability therefore will be denied as to this ground.[65]

---

[63](...continued)
Court precedent extant at the time of the state court's decision.

[64]*Burt v. Titlow*, 134 S.Ct. 10 (2013), does not support this strained argument. The Supreme Court's primary focus in *Titlow* was on whether the court of appeals had correctly held that the state court factual findings constituted an unreasonable determination of fact. The *Titlow* opinion never considered a question as to what constituted clearly established federal law as of the time of the state court's adjudication on the merits. A Supreme Court decision does not constitute precedent for a question that the Court did not even note, much less consider. Nor could the opinion overrule by (strained) implication legions of considered opinions making express holdings as to what constitutes "clearly established federal law." *Titlow* does not remotely hold, or suggest, that a state court's application of federal law *must* be reviewed for reasonableness even when the legal framework applied by the state court did not constitute clearly established federal law at the time of its decision.

[65]In contrast to Ground 1, the Court has definitively held in this case that the federal constitutional claims in Ground 2 were exhausted on direct appeal. ECF No. 23, at 4-6. The federal claims therefore have been adjudicated on the merits, and that adjudication is subject to deferential review under AEDPA. The later application of the law of the case doctrine to the claims on the state post-conviction appeal thus essentially is a non-event, and the parties do not argue otherwise.

***Ground 3(a): Effective Assistance of Counsel – Juror Impartiality***

In Ground 3(a), petitioner alleges that he was denied effective assistance of counsel when trial counsel failed to conduct any cross-examination at the hearing on the motions for new trial or subsequent investigation with regard to juror Marnie Ramirez' romantic attraction for his codefendant Ricky Vazquez.

Extensive factual background pertinent to this claim is set forth in the Court's discussion of Ground 1, *supra*.[66]

At a state post-conviction evidentiary hearing, trial counsel testified, *inter alia*, that he did not seek additional investigation after the examination of Ramirez at the hearing on the motion for new trial because there was no evidence of juror misconduct prior to the verdict and he wanted to concentrate on what he believed to be stronger issues for the impending direct appeal.[67]

The Supreme Court of Nevada rejected the claim presented to that court in its July 23, 2013, decision on the post-conviction appeal on the following basis:

> . . . [A]ppellant argues that his trial counsel was ineffective during a post-verdict hearing regarding a juror who had begun a romantic relationship with appellant's codefendant. Appellant argues that the juror was biased and counsel should have personally questioned the juror at the hearing or requested additional time in order to investigate the juror's conduct. Appellant fails to demonstrate that counsel's performance was deficient or that he was prejudiced. The juror testified that the romantic relationship between her and appellant's codefendant did not begin until after the trial. She also stated that she had no bias against appellant and had followed her oath and all of the court's instructions while acting as a juror. Counsel testified at the evidentiary hearing *that the codefendant's counsel questioned the juror and he did not feel it necessary for him to question the juror as well.* Counsel also testified that he did not question the juror or request additional time to investigate the juror *because it was clear that the juror's romantic feelings for the codefendant formed after the jury had rendered a verdict for both defendants and there was no evidence that the juror was biased against appellant.* Tactical decisions such as this one "are virtually

---

[66]See text, *supra*, at 3-17.

[67]ECF No. 26-13 (Exhibit 77), at 8-9, 10-11 & 14-15.

unchallengeable absent extraordinary circumstances," *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989), which appellant does not demonstrate. Given the lack of evidence that the juror was biased or acted improperly during appellant's trial, appellant fails to demonstrate a reasonable probability of a different outcome had counsel posed questions to the juror or requested additional time to investigate the juror's conduct. Therefore, the district court did not err in denying this claim.

ECF No. 26-23 (Exhibit 87), at 3-4 (emphasis added).

The state supreme court found, *inter alia*, that "[c]ounsel . . . testified that he did not question the juror or request additional time to investigate the juror because it was clear that the juror's romantic feelings for the codefendant formed after the jury had rendered a verdict for both defendants and there was no evidence that the juror was biased against appellant."

Counsel did not so testify at the state post-conviction hearing, and the juror did not so testify at the post-verdict motion hearing. Counsel instead testified that he did not ask Ramirez any questions at the post-verdict hearing because "I don't know that I was a party to that because it was not my issue at that time."[68] He further acknowledged that no questions were asked of Ramirez at that time as to her beliefs or feelings.[69] At the post-verdict hearing, Ramirez did not provide any testimony that her romantic feelings for Vazquez formed only after the verdict, and she was not asked any questions as to bias as to Vincent.[70]

Because the state supreme court's rejection of Ground 3(a) was based upon an mistaken determination of fact in light of the evidence presented at the state court proceeding, the Court reviews Ground 3(a) *de novo*.

On petitioner's claim of ineffective assistance of counsel, he must satisfy the

---

[68]ECF No. 26-13 (Exhibit 77), at 8-9. This testimony also renders unreasonable the state supreme court's corollary finding that "[c]ounsel testified at the evidentiary hearing that the codefendant's counsel questioned the juror and he did not feel it necessary for him to question the juror as well." Counsel did not testify that he failed to question Ramirez because he did not feel it was necessary after Vazquez counsel's examination. He instead testified that he did not believe that it was his issue at that time. That is a markedly different reason for not examining Ramirez at that time.

[69]*Id.*, at 9 & 16-17. See also *id.*, at 11, lines 2-4 ("Q: And so frankly we just don't know if her bias towards Mr. Vazquez impacted her bias – or if she had a bias towards Mr. Vincent? A: I would agree.")

[70]ECF No. 14-23 (Exhibit 48).

two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's deficient performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). On the performance prong in particular, "[e]ven under a *de novo* review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. Accordingly,

> Although courts may not indulge "*post hoc* rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions, *Wiggins*, 539 U.S., at 526–527, 123 S.Ct. 2527, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam). After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind. 466 U.S., at 688, 104 S.Ct. 2052.

*Richter*, 562 U.S. at 109-10.

Applying this – single – layer of deferential review, there is no substantial issue as to the reasonableness of counsel's performance with regard to not examining juror Ramirez at the post-verdict hearing. The contemporaneous record reflects that counsel had not been served with any of the filings regarding the juror issue prior to the hearing and further that he

had not seen the juror letters.[71]  While counsel testified years later at the post-conviction evidentiary hearing as to his recollection that it was not his issue at that time, there was no deficiency in performance in not seeking to question the juror at that time  without having had sufficient prior notice of the issue and an opportunity to review the underlying materials and prepare an examination.

The more potentially substantial issue as to the reasonableness of counsel's performance concerns his decision to not pursue further investigation thereafter upon receiving copies of the juror's letters.  In this regard, as noted previously, counsel testified that he did not pursue further investigation because there was no evidence of juror misconduct prior to the verdict and he wanted to concentrate on what he believed to be stronger issues for the impending direct appeal.[72]

A decision to not further investigate a particular issue does not necessarily equate to deficient performance under *Strickland*:

> *Strickland* . . . permits counsel to "make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. 2052. . . . .
>
> . . . . There are . . . "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.*, at 689, 104 S.Ct. 2052.  Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach. *Ibid.* . . . .
>
> . . . . An attorney can avoid activities that appear "distractive from more important duties." *Bobby v. Van Hook*, 558 U.S. 4, 11, 130 S.Ct. 13, 19, 175 L.Ed.2d 255 (2009) (*per curiam*). Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies. *See Knowles, supra*, at 125–126, 129 S.Ct. at 1421–22; *Rompilla v. Beard*, 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Wiggins v. Smith*, 539 U.S. 510, 525, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Strickland*, 466 U.S., at 699, 104 S.Ct. 2052.

*Richter*, 562 U.S. at 106-07.

---

[71]See text, *supra*, at 9-11. See also ECF No. 26-13 (Exhibit 77), at 5 & 13-14 (re: notice and service).

[72]ECF No. 26-13 (Exhibit 77), at 8-9, 10-11 & 14-15.

The Court holds on *de novo* review that counsel did not render deficient performance by not pursuing further investigation of juror Ramirez.  Viewed objectively, there was no reasonable additional avenue to pursue with regard to pre-verdict juror misconduct.  Neither the letters nor Ramirez' testimony reflected any possibility of improper conduct or contact prior to the verdict.  Moreover, again viewed objectively at the time and not after the fact, N.R.S. 50.065(2)(a) would have appeared to bar any inquiry of the juror as to her pre-verdict emotions and state of mind.  It thus was not objectively unreasonable for counsel to marshal his resources to develop and present what he believed to be stronger issues for appeal.

The Court further holds on a *de novo* review that petitioner cannot demonstrate resulting prejudice, *i.e.,* that there was a reasonable probability of a different outcome on either a possible renewed post-verdict motion or on direct appeal sufficient to undermine confidence in the outcome in the state court.  Petitioner essentially was given full reign at the state post-conviction evidentiary hearing to present the evidence that he maintains effective counsel instead would have presented with an adequate investigation. Ramirez testified, *inter alia*: (1) again as to the absence of any pre-verdict contact or misconduct; (2) as to her flirtation with Vazquez subsequent to the post-verdict hearing; (3) essentially as to the superficiality of her feelings and of her professions of feelings to Vazquez; and (4) as to her adherence to her oath as a juror notwithstanding any romantic attraction for Vazquez.[73] Contrary to petitioner's suggestion, a juror's romantic attraction to a defendant's adverse party in a criminal proceeding is not a *per se* structural error that automatically invalidates a verdict without a showing of improper conduct or contact during trial, a concealed preexisting relationship, and/or associated dishonesty during *voir dire*.  What such a circumstance – if even learned of in the first instance – warrants is an adequate investigation as to any claim of bias, if such a claim actually is made in the lower court.[74]  When Vincent presented such

---

[73]See text, *supra*, at 14-15.

[74]See text, *supra*, at 20-21, 22 & 24-26.  The Court is referring both to the underlying authorities discussed in the course of its application of deferential AEDPA review to Ground 1 as well as to its *de novo*
(continued...)

a claim of bias to the state district court on state post-conviction review, the court conducted a full inquiry and found against petitioner. That outcome as well as an objective assessment of the facts leads to the conclusion that there was not a reasonable probability of a different outcome sufficient to undermine confidence in the outcome if trial counsel had presented the juror testimony later presented at the state post-conviction evidentiary hearing instead prior to entry of judgment in the original state criminal proceedings.

The Court accordingly holds, on a *de novo* review, that Ground 3(a) does not provide a basis for federal habeas relief. The Court will grant a certificate of appealability on this ground, however, for consideration on appeal together with Ground 1.

### Ground 3(b): Effective Assistance – Defense Forensic Expert Testimony

In Ground 3(b), petitioner alleges that he was denied effective assistance of trial counsel when counsel failed to retain expert witnesses to challenge the State's expert witness testimony by James Krylo as to firearms and toolmark analysis and by Joseph Matvay as to bullet trajectory.

Relevant background as to the related trial forensic testimony is set forth in the Court's discussion of Ground 1, *supra*, within an overall summary of the trial evidence.[75]

Petitioner relies upon a report allegedly published by the National Academy of Sciences in February 2009 titled *Strengthening Forensic Science in the United States: A Path Forward*. It does not appear that the record reflects how widely the report would have been distributed immediately upon its stated publication date. In February 2009, Vincent's case already was on direct appeal, but the appeal had not yet been briefed.

Petitioner relies in particular upon a passage from the report stating generalized conclusions questioning the precision, consistency and reliability of firearms and toolmark analysis – without any discussion of trajectory analysis. While the second amended petition

---

[74](...continued)
analysis of that ground.

[75]See text, *supra*, at 5-6.

quotes from the report, neither the pleading nor the reply provide the Court with a specific

record citation to an exhibit with a copy of the report that is on file in the record in this matter.[76]

The testimony at the state post-conviction evidentiary hearing on this claim consisted

of only the following:

> Q    Did you ever consider in this case hiring a ballistics expert regarding investigation into the trajectory of the bullets and pattern?
>
> A    Not really, and I don't think that was really an issue until the codefendant's counsel got up and started arguing all sorts of things that were belied by Mr. Vazquez's confession [which was excluded at trial], but they were free to argue it.
>
> Q    And if the motion to sever had been granted, do you think that wouldn't have been an issue; is that accurate?
>
> A    Right, and I think things might have been done a little differently if it had been separate.
>
> Q    And once the codefendant's counsel began eliciting this testimony or evidence, at that point did you consider hiring an expert on – on doing some sort of ballistic testing?
>
> A    At that point, no.
>
> Q    Are you aware of the NAS report that has since come down?
>
> A    You provided a copy – but at that time I was not aware of it.
>
> Q    It came down in 2009, which is when Mr. Vincent's appeal was still pending.  Did you ever consider filing any kind of supplemental briefing to the Nevada Supreme Court on that issue?
>
> A    No.

ECF No. 26-13 (Exhibit 77), at 12-13.

The foregoing testimony discussed only ballistic trajectory evidence, not firearms and

toolmark evidence.

Petitioner has not provided this Court with a record citation to any actual expert

---

[76]See ECF No. 36, at 16-17; ECF No. 47, at 25-26.

evidence presented to the state courts on post-conviction review wherein ballistics, firearms and toolmark, and/or other experts: (a) reviewed the reports and trial evidence presented by the State's experts; (b) opined that the expert evidence was not reliable based on specifics rather than the broad generalities stated in the organizational report relied upon by petitioner; and (c) presented contrasting specific expert opinion based upon the specific evidence in Vincent's case raising a reasonable probability of a different outcome at trial sufficient to undermine confidence in the outcome.[77]

In its July 23, 2013, order affirming the denial of state post-conviction relief, the Supreme Court of Nevada rejected the claim presented to that court on the following basis:

> . . . [A]ppellant argues that his trial counsel failed to hire independent forensics, toolmark, or firearms experts. Appellant also argues that counsel should have sought a new trial based on a recent report that questioned the validity of those types of expert opinions. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. Appellant fails to demonstrate that there were any experts who would have testified differently than the expert witnesses who testified on behalf of the State at trial. *See Hargrove v. State*, 100 Nev. 498, 502–03, 686 P.2d 222, 225 (1984). There was overwhelming evidence presented at trial that appellant was guilty of murder and did not act in self-defense. Accordingly, appellant fails to demonstrate a reasonable probability of a different outcome had counsel hired independent experts or questioned the trustworthiness of this type of evidence. Therefore, the district court did not err in denying this claim.

ECF No. 26-23 (Exhibit 87), at 4.

The state supreme court's rejection of the claim under the prejudice prong was neither contrary to or an unreasonable application of *Strickland* and its progeny. Even if the Court were to assume *arguendo* that the material excerpted from the alleged report in petitioner's

---

[77]Petitioner posits in the second amended petition that "[a]rguably, if bullets were removed from the cushioning of the seats, headrests, or plastic frame area of the car, the removal process could have tainted the evidence and affected any determination of a purported trajectory of the bullets." ECF No. 36, at 16. There was no testimony at trial that forensic investigators were able to locate and remove any bullets from these areas or that bullets necessarily would have lodged previously in these areas. See crime scene investigator testimony cited in n. 11, *supra*. Petitioner apparently is suggesting that Vincent may have removed bullets from these areas, without any supporting evidence in the trial record. Federal habeas counsel's bald suppositions as to what may have happened and as to how that might have affected the forensic evidence does not constitute evidence, much less competent expert evidence.

-36-

pleading accurately and fairly reflects the content of the full report,[78] the broad generalities in that excerpt do not alone negate the reliability and validity of the specific expert testimony presented at Vincent's trial. Moreover, petitioner presented no specific expert testimony contradicting or calling into question the State's expert testimony, much less establishing a reasonable probability of a different outcome at trial or on appeal and undermining confidence in the outcome in those proceedings. The state supreme court's rejection of this fundamentally unsupported claim of prejudice was neither contrary to or an unreasonable application of clearly established federal law.

Ground 3(b) therefore does not provide a basis for federal habeas relief.[79]

**Ground 4: Effective Assistance of Appellate Counsel**

In Ground 4, petitioner alleges that he was denied effective assistance of appellate counsel when counsel allegedly failed to fully present the factual or legal basis of the federal claims in Ground 1 (juror bias) and Ground 2 (failure to sever) on direct appeal.

The state high court rejected the claim presented to that court on the following basis:

> . . . [A]ppellant argues that the district court erred in denying his claims of ineffective assistance of appellate counsel. To prove ineffective assistance of appellate counsel, a petitioner must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that the omitted issue would have a reasonable probability of success on appeal. *Kirksey v. State*, 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996). Both components of the inquiry must be shown, *Strickland*, 466 U.S. at 697. Appellate counsel is not required to raise every non-frivolous issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Rather, appellate counsel will be most effective when

---

[78]Petitioner has the burden of proof on federal habeas review. *Pinholster*, 563 U.S. at 569. Part of that burden is providing specific record citation to the location, if any, of alleged evidence in the federal record.

[79]While the Court has no occasion to also reach the performance prong of the analysis, it notes that: (1) petitioner has not established that, objectively reasonably, defense counsel should have been aware of the report relied upon by petitioner herein even during the pendency of the direct appeal; (2) it is perhaps possible, but not necessarily likely, that defense counsel would have been able to retain and present a ballistics expert mid-trial after seeing the arguments made by Vazquez with regard to the ballistics evidence; and (3) it is far less possible and less likely that the Supreme Court of Nevada would have given any material consideration on direct appeal to the February 2009 report, which was not even in existence during the trial and thus necessarily was not part of the record in the lower court.

every conceivable issue is not raised on appeal. *Ford*, 105 Nev. at 853, 784 P.2d at 953. As stated previously, we give deference to the court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader*, 121 Nev. at 686, 120 P.3d at 1166.

First, appellant argues that his appellate counsel was ineffective for failing to adequately argue on direct appeal that the trial court should have severed his trial from that of his codefendant. Appellant acknowledges that the underlying claim was raised and rejected on direct appeal, but asserts that counsel erred in citing to certain cases which appellant argues did not support his claim. Appellant fails to demonstrate that his counsel's performance was deficient or that he was prejudiced. Counsel testified at the evidentiary hearing that he raised arguments and cited to the cases that he believed supported the severance claim. Tactical decisions such as this one "are virtually unchallengeable absent extraordinary circumstances," *Ford*, 105 Nev. at 853, 784 P.2d at 953, which appellant does not demonstrate. Given the overwhelming evidence of appellant's guilt, appellant fails to demonstrate that this claim had a reasonable likelihood of success had counsel argued the underlying claim differently. Therefore, the district court did not err in denying this claim.

Second, appellant argues that his appellate counsel was ineffective for failing to adequately address the issue regarding juror bias stemming from the after-trial romantic relationship between a juror and his codefendant. Appellant acknowledges that this issue was raised on direct appeal, but asserts that counsel erred in failing to argue this issue at length or argue that this issue violated appellant's rights under the U.S. Constitution. Appellant fails to demonstrate that his counsel's performance was deficient or that he was prejudiced. Counsel testified at the evidentiary hearing that while he raised the issue on appeal, he did not feel it would be successful because it was clear that the romantic contact between the juror and the codefendant only occurred after the trial's conclusion. Counsel testified that he wanted to focus on what he felt were stronger issues and that was the reason he did not include a lengthier argument on the juror issue. Given the lack of evidence to support a claim of juror bias, appellant fails to demonstrate that this was an improper tactical decision. *See id.* Appellant fails to demonstrate a reasonable likelihood of success on appeal had counsel argued the juror-bias issue at length or raised the issue as a claim of error under the U.S. Constitution. Therefore, the district court did not err in denying this claim.

ECF No. 26-23 (Exhibit 87), at 4-6.[80]

---

[80]The underlying testimony by counsel at the state post-conviction evidentiary hearing can be found

(continued...)

-38-

Petitioner has not demonstrated on federal habeas review that the state supreme court's rejection of this claim was either contrary to nor an unreasonable application of *Strickland* and its progeny.

When evaluating claims of ineffective assistance of appellate counsel, the performance and prejudice prongs of the *Strickland* standard partially overlap. *E.g., Bailey v. Newland*, 263 F.3d 1022, 1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). Effective appellate advocacy requires weeding out weaker issues with less likelihood of success. The failure to present a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice to the client for the same reason – because the omitted issue has little or no likelihood of success on appeal. *Id.*

In the federal reply, petitioner posits that respondents do not dispute that the entire basis of Grounds 1 and 2 was adjudicated on the merits by the state courts and maintains that Ground 4 thus is superfluous. Petitioner presents no further argument on Ground 4 in the reply beside the essentially conclusory allegations in the second amended petition, asking the Court instead to grant relief on Grounds 1 and 2.[81]

Ground 4, on the showing and argument made, accordingly does not provide a basis for federal habeas relief.[82]

IT THEREFORE IS ORDERED that the petition for a writ of habeas corpus is DENIED on the merits and that this action shall be DISMISSED with prejudice.

---

[80](...continued)
at ECF No. 26-13 (Exhibit 77), at 10, 11-12, 14 & 15-16.

[81]ECF No. 47, at 27.

[82]The Court notes the following with regard to the presentation of the juror bias claim on direct appeal. First, *qua* appellate advocate, retained defense counsel necessarily was limited to the existing record in the lower court with respect to any additional factual argument that petitioner maintains should have been presented on direct appeal. Second, with respect to legal argument in support of the claim, the Court is not persuaded that there is a reasonable probability – particularly on the lower court record at that time – of a different outcome on direct appeal if counsel had presented a more extensive legal argument with citation to the sparse related case law. In particular, petitioner's assumption that, with better briefing, he could have presented a viable claim of structural error automatically invalidating the verdict because of juror Ramirez' romantic attraction to Vazquez ultimately is not supported by the governing law. See text, *supra*, at 19-26.

1    IT FURTHER IS ORDERED that a certificate of appealability is GRANTED as to
2  Grounds 1 and 3(a) and is DENIED as to Grounds 2, 3(b) and 4.  Reasonable jurists would
3  not find the Court's rejection of the latter grounds to be incorrect or debatable, for the reasons
4  stated at pages 27-29 of the Court's order as to Ground 2, pages 35-38 as to Ground 3(b),
5  and pages 38-40 as to Ground 4.
6        The Clerk of Court shall enter final judgment accordingly, in favor of respondents and
7  against petitioner, dismissing this action with prejudice.
8        DATED: September 18, 2017.
9
10
11
12                                    HOWARD D. MCKIBBEN
                                    United States District Judge
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28